IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Robert Taylor,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Security National Insurance Co.,<br><br>　　　　　　　Defendant. | Case No.: 6:17-CV-02379-DCC<br><br><br>**MOTION FOR PARTIAL<br>SUMMARY JUDGMENT<br>AND MEMORANDUM IN SUPPORT** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiff, Robert Taylor, ("Taylor") respectfully moves for an order granting partial summary judgment to Taylor. Specifically, Taylor asserts that he is entitled to an order determining that either (a) insurance coverage exists for Taylor's criminal proceedings, or (b) the defendant, Security National Insurance Co., ("Security National") has a duty to defend Taylor until the issue of coverage is decided. The grounds for this motion are as follows.

### I.     Standard for Granting Motion for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. (internal quotation marks omitted).

### II.    Undisputed Factual Background

Security National issued a Directors and Officers Liability policy ("Policy") for Grand South Bank ("Bank") during the period relevant to this controversy. (*See* Policy attached hereto

1

as Exhibit A). The Policy included coverage for "any person, who was, now is, or shall be a director, officer, trustee, appointed member of an advisory board or committee, volunteer, organizer or **employee** of the **company**." (Policy, p. 17, Section III.P).

The Policy is a "claims made" policy and provides coverage for claims first made against an insured during the policy period. (Answer, ¶ 153, attached hereto as Exhibit B). The Policy defines a claim, in pertinent part, to be "a civil proceeding commenced by the service of a complaint or similar pleading;" or "a criminal proceeding commenced by a return of an indictment." (Policy, p. 15-16, Section III.B).

Taylor was a Vice-President of the Bank during this period. (First Am. Compl., ¶ 25 and attached hereto as Exhibit C; Answer, ¶ 25). Taylor, along with the Bank President, the Vice-President of the Bank's factoring department, and an Account Executive with the factoring department, have all been indicted by the United States ("Criminal Proceeding"). (First Am. Compl., ¶ 27; Answer, ¶ 27). All indicted employees have made a claim for defense costs to Security National. (First Am. Compl., ¶¶ 30, 31, 48; Answer, ¶¶ 30, 31, 48). All indicted employees except Taylor have settled with Security National. (First Am. Compl., ¶ 2; Answer, ¶ 2).

Importantly, both a senior claims adjuster and an outside attorney for Security National agreed Taylor's claim was covered. (*See* Claims Note, attached hereto as Exhibit F). Security National suddenly changed course and later denied coverage and refused to fulfill its duty to defend Taylor in the Criminal Proceeding. (*See* Denial Letter, attached hereto as Exhibit D). Security National asserts that coverage is barred. (Answer, ¶ 158).

2

### III. The Policy is a Claims-Made Policy and Plaintiff's Claim was First Made During the Period of Coverage

The Policy includes the following Executive Liability provision which covers Taylor:

> The **Insurer** will pay on behalf of an **Insured Person**, **Loss** that is the result of a **Claim** for a **Management Practices Wrongful Act** first made during the **Policy Period** . . .

(Policy, p. 14, Section I.A).

Taylor is an Insured Person under the Policy. Attorneys' fees for defense costs constitute a Loss. The Criminal Proceeding is a Claim that alleges Management Practices Wrongful Acts. Therefore, absent an exclusion, the Policy Period applies to Taylor and his criminal indictment.

The Policy defines "Insured Person" as "any person, who was, now is, or shall be a director, officer, . . . or **employee** of the **company**." (Policy, p. 17, Section III.P). Taylor was, until August 29, 2017, a Vice President and officer of the Bank. (First Am. Compl., ¶ 25; Answer, ¶ 25). Accordingly, he is an "Insured Person."

The Policy defines "Loss" as "any amount which any **insured person** . . . is legally obligated to pay as a result of a **claim**, and includes . . . reasonable **defense expenses**." (Policy, pp. 17-18, Section III.T). "Defense expenses" are defined as "reasonable costs, attorneys' fees, charges and expenses incurred by **insured persons** . . . in the investigation, defense or appeal of a covered **claim**." (Policy, p. 16, Section III.G). Taylor has incurred, and continues to incur, expenses associated with the investigation and defense of the criminal charges against him, including attorneys' fees and other expenses. These are "Defense Expenses" that constitute a covered Loss under the Policy.

The Policy defines a "Claim" as "a criminal proceeding commenced by a return of an indictment." (Policy, pp. 15-16, Section III.B). The Criminal Proceeding was initiated upon the return of the first indictment, on June 26, 2016. (First Am. Compl., ¶ 27; Answer, ¶ 27). Taylor

3

was not charged until the return of the Third Superseding Indictment on August 29, 2017. (First Am. Compl., ¶ 27; Answer, ¶ 27). On September 8, 2017, Taylor made a demand for coverage under the Policy, including defense expenses. (First Am. Compl., ¶ 51; Answer, ¶ 51).

The Policy defines "Management Practices Wrongful Act" as "any actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by an **insured person** acting solely in their capacity as: director, officer, . . . or **employee** of the **company**." (Policy, p. 18, Section III.U). The charges against Taylor in the Criminal Proceeding allege actions that would constitute errors or omissions or breaches of duty if proven. (*See* Superseding Indictment, attached as Exhibit E).

The Policy defines the "Policy Period" as "the period from the effective date of this policy to . . . the policy expiration date." (Policy, p. 18, Section III.X). The policy period is defined in the Declarations as August 6, 2014, to August 2, 2017. (Policy, p. 6).

Because the Criminal Proceeding was initiated by the return of the first indictment on June 26, 2016, (First Am. Compl., ¶ 27; Answer, ¶ 27), and the Bank notified Security National thereof shortly after, (First Am. Compl., ¶ 30; Answer, ¶ 30), the claim was first made within the Policy Period.[1] Accordingly, the "Claim" was made when the Criminal Proceeding was commenced by the return of an indictment, on June 26, 2016, even though Taylor's right to coverage did not attach until he was named individually in the Third Superseding Indictment.

---

[1] The Policy also provides that "[a]ny claim made subsequent to the Policy Period as to which written notice was received by the Insurer within the Policy Period . . . shall be treated as a claim made during the Policy Period." (*See* Policy at 15, Section II). Security National does not contest that they received notice of the Criminal Proceeding during the Policy Period. (*See* Am. Compl. ¶ 30; Ans. ¶ 30).

Therefore, absent an exclusion in the Policy, Taylor is an insured person entitled to coverage for losses, including ongoing defense expenses, incurred by him as a result of the Criminal Proceeding.

### IV.     Coverage of Taylor's Claim is not Excluded by the Policy

Security National wrongly asserts that, due to two prior civil cases against the Bank, ("Civil Cases") coverage is barred by two exclusions in the Policy: (a) that Taylor's claim is deemed to have been made before the Policy Period; and (b) that Taylor's claim constitutes Prior and Pending Litigation. (Answer, ¶ 158).

The insurer bears the burden of establishing the applicability of policy exclusions. *See Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005). "[E]xclusions in an insurance policy are always construed most strongly against the insurer." *Am. Credit of Sumter, Inc. v. Nationwide Mut. Ins. Co.,* 378 S.C. 623, 628–29, 663 S.E.2d 492, 495 (2008); *see also McPherson v. Michigan Mut. Ins. Co.*, 310 S.C. 316, 426 S.E.2d 770 (1993) (exclusions are to be construed narrowly and to benefit of the insured). Accordingly, "an insurance contract which is in any respect ambiguous or capable of two meanings must be construed in favor of the insured." *Beaufort Cty. Sch. Dist. v. United Nat'l Ins. Co.*, 392 S.C. 506, 516, 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (internal quotation omitted).

First, Security National asserts that coverage of Taylor's claim is excluded because the two prior Civil Cases pre-dated Security National's policy. Security National argues that because the Criminal Proceeding involves interrelated wrongful acts with the Civil Cases, the claim for the Criminal Proceeding is deemed to have been made at the same time as the Civil Cases. As a result, Security National contends that the Criminal Proceeding also pre-dates the Policy Period. Its basis for this assertion is that the Policy states:

5

> All claims involving Interrelated Wrongful Acts shall be considered a single claim and shall be deemed to have been first made when the earliest claim was first made.
>
> (Policy, p. 16, Section III.B).
>
> **and**
>
> Claims based upon or arising out of the same wrongful act or interrelated wrongful acts committed by one or more insured parties shall be considered a single claim . . .
>
> (Policy, p. 24, Section VII.E).
>
> **and**
>
> The Insurer shall not be liable to make any payment for loss in connection with any claim based upon, arising out of, relating to, in consequence of, or in any way involving . . . any claim first made prior to the effective date of the policy period [August 6, 2014].
>
> (Policy, p. 20, Section IV.A.1).
>
> **where** Interrelated Wrongful Acts is defined as:
>
> [W]rongful acts that have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions.
>
> (Policy, p. 17, Section III.Q).

Second, Security National asserts that the Criminal Proceeding involves common facts with the two Civil Cases. As such, it contends that the Prior and Pending Litigation Exclusion contained in the policy excludes coverage of Taylor's claim. (Denial Letter, p. 17, Section II). The Prior and Pending Litigation Exclusion states:

> The Insurer shall not be liable to make any payment for **loss** in connection with any **claim** based upon, arising out of, relating to, in consequence of, or in any way involving:
>
> any **claim** arising out of or in any way involving any litigation against the **company** or any **insured person** initiated prior to [August 6, 2014], or arising out of or in any way involving the same

6

>> or substantially the same fact, circumstance or situation underlying or alleged in such prior litigation.

(Policy, pp. 20, 66).

As discussed below, Security National's arguments are without merit.

### a. The Exclusions Asserted Render Coverage Illusory

The literal application of the language which defines the claimed exclusions is so broad that it necessitates consideration of the illusory coverage doctrine. The purpose of the illusory coverage doctrine is to protect insureds where the literal terms of the policy "would render the policy virtually meaningless" because it would exclude "the very risk contemplated by the parties." *S.C. Farm Bureau Mut. Ins. Co. v. Kennedy*, 398 S.C. 604, 615, 730 S.E.2d 862, 867 (2012); *Isle of Palms Pest Control Co.*, 319 S.C. at 18-19, 459 S.E.2d at 321; *accord NGM Ins. Co. v. Carolina's Power Wash & Painting, LLC*, No. CIV. 2:08-CV-3378-DC, 2010 WL 146482, at *5 (D.S.C. Jan. 12, 2010) (unpublished) ("[T]he broad scope of the . . . exclusion in Isle of Palms prevented coverage for the very purpose that the contractor sought a commercial general liability policy."), *aff'd sub nom. NGM Ins. Co. v. Kuras*, 407 F. App'x 653 (4th Cir. 2011); *W. World Ins. Co. v. Empire Fire & Marine Ins. Co.*, No. C.A.7:06 217 RBH, 2006 WL 3337427, at *7 (D.S.C. Nov. 16, 2006) (unpublished) ("[I]f the auto exclusion in the . . . policy were applied to deny a duty to defend in the case at bar, this would exclude the very risks that American Trans Med was trying to insure.").

The Policy's definition of Interrelated Wrongful Acts and the language in the Prior and Pending Litigation exclusion render coverage illusory under the Policy.

Under the definition of Interrelated Wrongful Acts in the Policy, an insured is barred from bringing a Claim that involves Interrelated Wrongful Acts with a prior Claim. The Policy provides that "Interrelated Wrongful Acts" are "wrongful acts that have as a common nexus *any* fact,

7

circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions." (Policy, p. 17, Section III.Q) (emphasis added).  As such, a literal interpretation of this policy provision would preclude coverage under the Policy for any claim that shared a single fact with any previous litigation.

The Prior and Pending Litigation Exclusion is drafted in such a way that it creates a similar issue to the definition of Interrelated Wrongful Acts, but the literal interpretation is actually even broader.  The exclusion precludes coverage for "any claim . . . in any way involving . . . the same or substantially the same fact."  Again, all claims made against the Bank or officers and employees of the Bank would involve at least one fact that similar to the previous claims.

A literal interpretation of the exclusions asserted would bar any claim and the Bank would have paid for coverage that was wholly useless.  "The literal interpretation of policy language will be rejected where its application would lead to unreasonable results and the definitions as written would be so narrow as to make coverage merely 'illusory.'" *S.C. Farm Bureau Mut. Ins. Co.*, 398 S.C. at 615, 730 S.E.2d at 867.  Because a literal interpretation of the exclusions would endorse such an unfair outcome, the literal interpretation must be rejected.

### b.  The Exclusions Asserted are Ambiguous

If a literal interpretation of the asserted exclusions would render coverage illusory, then any other interpretation must be ambiguous because the exclusions would be subject to more than one interpretation.  *See Beaufort Cty. Sch. Dist.*, 392 S.C. at 516, 709 S.E.2d at 90.  Further, any other interpretation of the exclusions would only lead to more questions that are left unanswered by the Policy.  How many facts do the claims need to have in common?  Are there certain facts that are more important in the analysis than other facts?

Other courts, looking to nearly similar language, have agreed. "Reasonable people can interpret 'the same or substantially the same' as involving differing scopes of sameness, so those terms are ambiguous and must be interpreted in favor of coverage under these circumstances." *Lafayette Life Ins. Co. v. Arch Ins. Co.*, 784 F. Supp. 2d 1034, 1044 (N.D. Ind. 2011).

Security National is essentially stating that it has answered the unanswered questions, that the Criminal Proceeding and the Civil Cases contain several similar facts and are therefore related claims. (Denial Letter, p. 16). By way of example, Security National lists thirteen similarities between the Criminal Proceeding and the Civil Cases in its Answer. (Answer, ¶¶ 168, 170). However, allowing Security National to unilaterally make this determination would allow it to exploit the ambiguity in the Policy whenever necessary. Security National should not be allowed to decide whether the similarities are sufficient to overcome the differences when the literal interpretation of the policy language would require exclusion with only one instance of similarity. The result is that the exclusion is ambiguous and Security National's list of similarities proves it. As such, the ambiguous exclusions must, by law, be interpreted in favor of coverage.

### c. The Civil Cases and Criminal Proceeding do not Constitute a Single Claim

Even if the illusory coverage doctrine is not triggered by the asserted Policy exclusions or even if the literal interpretation of the Policy exclusions is not deemed ambiguous, South Carolina law still requires that the exclusions be narrowly construed against Security National. *Am. Credit of Sumter, Inc.*, 378 S.C. at 628–29, 663 S.E.2d at 495; *see also McPherson*, 310 S.C. at 316, 426 S.E.2d at 770. A comparison of the Civil Cases with the Criminal Proceeding shows that the two actions do not constitute a single claim.

The Policy provides that "Interrelated Wrongful Acts" are "wrongful acts that have as a common *nexus* any fact, circumstance, situation, event, transaction or series of facts,

9

circumstances, situations, events, or transactions." (Policy, p. 17, Section III.Q) (emphasis added). The alleged wrongful acts, therefore, must share a "common nexus." A "nexus" is defined as "a connection or link, often a causal one." Black's Law Dictionary (10th ed. 2014). Accordingly, the Civil Cases and Criminal Proceeding may constitute Interrelated Wrongful Acts if they share a logical or causal connection. However, even claims sharing logical or causal connections may "at some point . . . be so attenuated or unusual that an objectively reasonable insured would not have expected that they be treated as a single claim under the policy." *Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F. Supp. 3d 1211, 1230-31 (N.D. Ala. 2015) (internal quotation omitted).

In determining whether claims are related, courts have looked to similar policy language and, in at least in one similar case, looked to the following factors, none of which is by itself necessarily outcome-determinative: (1) whether the claims are made by the same or different parties; (2) whether the claims arise from the same or different acts or omissions; (3) whether the acts are part of a pattern of similar activity; (4) whether there is a significant lapse of time between the causes giving rise to the claims; and (5) whether the claims arise from the same or a different injury." *Id.* at 1231 (citing to John E. Zulkey, Related and Interrelated Acts Provisions: Determining Whether Your Claims Are Apples and Oranges, or Peas in A Pod, 50 Tort Trial & Ins. Prac. L.J. 83, 99-104 & nn.46-55 (2014) and the cases cited therein).

Applying these factors to this case demonstrates that the Civil Cases and the Criminal Proceeding are not related.

First, the claims were made by different parties. The Civil Cases were raised by private parties, whereas the Criminal Proceeding was initiated by the United States. In fact, the plaintiffs in the Civil Cases would have been entirely unable to raise the charges in the Criminal Proceeding,

because no private causes of action exist for these offenses. The lack of identity of parties and claims weighs against a finding of relatedness.

Second, the claims arise from different acts or omissions. The Civil Cases arose from the Bank's alleged failure to correctly prioritize repayment of its clients' debts and paying itself with funds that were subject to superior claims. The allegations in the Criminal Proceeding are that the defendants defrauded the Bank, embezzled bank funds, and caused materially false entries in the Bank's books and records to deceive regulators. The Civil Cases arose from the Bank's actions in working with a client to allegedly intentionally interfere with pre-existing contractual relationships. The Criminal Proceeding arose from wholly separate alleged criminal violations by several Bank employees to the Bank's detriment.

The claims in the Civil Cases and the Criminal Proceeding arise from different parties and different acts and omissions. *See Morden v. XL Specialty Ins.*, 177 F. Supp. 3d 1320, 1333 (D. Utah 2016) (finding that SEC enforcement action against investment firm and subsequent lawsuit from client involved facts that were not related when there was no "logical or causal connection" between the specific claims raised in each matter). For instance, the alleged false entries in the Bank's books and records that are charged in the Criminal Proceeding have no bearing on the claims asserted in the Civil Cases. There is no indication that the claimants in the Civil Cases would have had any access to the Bank's internal books and records. Additionally, the criminal charge that the defendants misapplied and embezzled Bank funds is wholly unrelated to whether the Bank helped its client evade payment of his creditors. These and other allegations of wrongful acts in the Criminal Proceeding have no logical or causal connection to the claims in the Civil Cases.

11

Third, the acts alleged in each matter are not part of a similar pattern of activity as that term is used in insurance coverage. This issue generally arises when a single actor inflicts a repeated harm on the same victim. *See, e.g., Beaufort Cty. Sch. Dist.*, 392 S.C. at 517-18, 709 S.E.2d at 91 (claims for sexual abuses of the same student were all "related," while a claim for a series of sexual abuses of one student were unrelated to a series of claims for sexual abuse of another student). The charges in the Criminal Proceeding do not involve claims that are a continuation in a series of actions that underlay the claims in the Civil Cases. Rather, as discussed above, the claims arose from separate actions committing separate harms on separate victims. In addition, the charges in the Civil Cases involved particular transactions relevant to those particular Plaintiffs. The Criminal Proceeding addresses the harm that allegedly resulted from a broad failure of internal controls. *See Axis Surplus Ins. Co. v. Johnson*, No. 06-CV-500-GKF-PJC, 2008 WL 4525409, at *9 (N.D. Okla. Oct. 3, 2008) (unpublished) (finding claims were not related when one suit involved allegations about a particular transaction and the subsequent claim involved sweeping claims of internal mismanagement). This difference in the scope of the alleged harm is sufficient to make the Civil Cases and the Criminal Proceedings different claims under the Policy.

Fourth, there is a significant lapse in time between the alleged causes giving rise to the complaints in the Civil Cases and the indictment in the Criminal Proceeding. The Civil Cases themselves were filed years before the Criminal Proceeding. In fact, they were both settled several years before the first Indictment. If the allegations in the publicly-filed Civil Cases were enough to support the charges in the Criminal Proceeding, then the government would have brought its charges sooner and Aquent and BHC would be victims of the criminal charges. They are not, because the charges in the Criminal Proceeding arise from wholly different acts and different alleged breaches of duty to different parties.

12

Fifth, and finally, the claims arise from entirely separate types of injuries. The claimants in the Civil Cases allege economic injuries resulting from their inability to recover on certain loans. The Criminal Proceeding involves alleged criminal offenses, including bank fraud, in which the alleged victims are the Bank and the United States. There is no indication that the claimants in the Civil Cases could have filed claims just on the misconduct alleged in the Criminal Proceeding. *See Morden*, 177 F. Supp. 3d at 1336 (holding that claims were not related when the wrongful conduct alleged in one claim was narrower than the other claim, and there was no evidence that claim would have been asserted on the non-overlapping conduct). Likewise, there is no indication that criminal charges would have been filed based only on the conduct alleged in the Civil Cases— notably, the Bank never has been accused of criminal wrongdoing.

Courts that have considered facts akin to the case at bar have reached similar result. In *ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008), applying Maryland law, the court looked to similar language to determine there was no nexus between a private suit and a federal multi-state investigation, and thus granted summary judgment to the insured on the issue of coverage. As the court explained,

> The two claims are distinguishable because the [first] . . . action is a private suit by individuals seeking monetary damages; it arises from the specific experiences of those individuals . . . . In contrast, the Multi–State Claim is a governmental investigation into alleged violations of various Consumer Protection statutes, under which the government can seek injunctive relief as well as civil and criminal penalties.

*Id*. at 801 (also noting that that the scope of the governmental investigation targeted defendants who were not listed in the initial action).

Similarly, here we are dealing with criminal allegations, which are even more divorced from a private civil action than are state consumer protection actions. Moreover, we have a Defendant who was never involved in – or a party to – the prior litigation.

The Fourth Circuit recently discussed *ACE Am. Ins. Co.* in a lengthy published opinion. *See W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171 (4th Cir. 2016). While the Fourth Circuit did rule in favor of the insurance company, it did so after favorably citing *ACE Am. Ins. Co.* and noting that the case there was different because both lawsuits involved a civil claim, the defendants in each case were closely-related business entities, and the same person brought each lawsuit. *Id.* at 173, 177. Following the Fourth Circuit's logic, the exclusions fail here under the same analysis. The case at bar involves a criminal matter while the prior lawsuits were civil cases; the Defendant here is an individual and the defendant in the prior claims was a business entity not owned by Taylor; and the Criminal Proceeding has been brought by the federal government as opposed to individual corporations in the Civil Cases. It also critical to note that the Fourth Circuit based its decision in favor of the insurer in *W.C. & A.N. Miller Dev. Co.* in part on the fact that, unlike in South Carolina, "there is no rule in Maryland that insurance policies are to be construed most strongly against the insurer." *Id.* at 176.

In sum, an analysis of the Civil Cases and Criminal Proceeding in light of the relevant authority reveals that they are not interrelated. They involve different claims made by different parties for different purposes involving different acts that resulted in different injuries. The Bank was a defendant in the Civil Cases. The Bank is a victim in the Criminal Proceeding. Aquent and BHC were alleged victims in the Civil Cases. Aquent and BHC are not victims in the Criminal Proceeding. Taylor was never a party or named in any pleadings in the Civil Cases.  Taylor is a named Defendant in the Indictment.  These actions do not involve Interrelated Wrongful Acts under the Policy. Accordingly, Taylor's Claim does not relate back to the instigation of the Civil Cases, and his Claim was timely made during the Policy Period.

### d. **The Criminal Proceeding did not Arise From the Civil Cases**

Security National's remaining assertion is that coverage is barred by the "arise from" language of the Prior and Pending Litigation Exclusion.

The Prior and Pending Litigation Exclusion applies to claims "arising out of or in any way involving any litigation against the company or any insured person prior to the PPL Date set forth below, or arising out of or in any way involving the same or substantially the same fact, circumstance or situation underlying or alleged in such litigation." (Policy, p. 66). As discussed above, a bar on coverage for litigation "in any way involving" "the same fact" alleged in previous litigation is unreasonably overbroad and would render the coverage illusory. Accordingly, the remaining question is whether the Criminal Proceeding "arose from" the Civil Cases.

As discussed above, the claims are not related. Moreover, under South Carolina law, to "arise from" has a particular and narrow meaning. "[F]or the purpose of construing an exclusionary clause in a general liability policy, 'arising out of' should be narrowly construed as 'caused by.'" *McPherson ex rel. McPherson v. Michigan Mut. Ins. Co.*, 310 S.C. 316, 426 S.E.2d 770, 771 (1993). To satisfy this "caused by" standard, the nexus between the cause and effect must be "immediate and direct." *See S.C. Farm Bureau Mut. Ins. Co. v. Berlin*, 2005 WL 7082978, at *3 (S.C. Ct. App. Jan. 25, 2005) (unpublished); *see also Canopius US Ins., Inc. v. Middleton*, 202 F. Supp. 3d 540, 547 (D.S.C. 2016).

There is no indication that the Criminal Proceeding was in any way "caused by" the Civil Cases. In short, this is not a *Qui Tam* action. In fact, the Criminal Proceeding was not instituted until years after the Civil Cases. It was brought by the United States government, not any party to the Civil Cases. The United States was on notice of the existence of the Civil Cases years prior, as it brought charges against Harrison for tax offenses in 2012. Nevertheless, the existence of the

15

publicly-filed Civil Cases did not spur the government to file charges against any of the parties involved. Instead, the Criminal Proceeding arose following a multi-year investigation into the Bank's internal operations. Accordingly, there is no indication that there is a nexus between the Civil Cases and the Criminal Proceeding, or that the latter "arose from" the former. Lacking this nexus, the Prior and Pending Litigation exclusion does not apply.

In sum, neither of the exclusions that Security National argues bar coverage for Taylor in this matter. There is no dispute that Taylor is otherwise an Insured Person stating a claim for defense expenses that otherwise would be covered by the Policy. Thus, because this is a covered claim to which no exclusions apply, the face of the pleadings in this matter demonstrate that Taylor is entitled to declaratory judgment that coverage exists for him and that Security National is in breach of the insurance contract by failing to provide that coverage.

## V.     Defendant is Required to Pay Plaintiff's Defense Expenses

The Policy requires Security National to indemnify Taylor for his defense expenses related to defending criminal allegations until a final adjudication establishes that Taylor committed the criminal acts or the allegations are otherwise established as facts. The Policy defines a claim as "a criminal proceeding commenced by return of an indictment." (Policy, pp. 15-16, Section III.B.4). Section IV.A.7. of the Policy provides that:

> [T]he **insured** person or the **company** shall be indemnified for **defense expenses** as to any **claim** alleging . . . fraudulent, dishonest or criminal actions, unless a judgment or final adjudication establishes such fraudulent, dishonest or criminal acts or if such acts are otherwise established in fact. In the event that the Insurer has no liability, the **insured person** or the **company** agrees to repay to the Insurer, upon demand, all monies advanced by the Insurer in connection with such **claim**.

(Policy, p. 20).

As such, Security National is required to indemnify Taylor for his defense expenses and Taylor or the Bank are required to repay Security National if it is determined that Security National has no liability.

Further, an insurer has a duty to defend where a claim is not "unambiguously excluded for coverage." *See Episcopal Church in S.C. v. Church Ins. Co. of Vermont*, 993 F. Supp. 2d 581, 593 (D.S.C. 2014). As stated in Section IV, *supra*, the exclusions being asserted by Security National either do not apply to Taylor's claim or, at best, are ambiguous in their application to Taylor's claim. Where there is no unambiguous exclusion, the intent of the parties to the Policy was that Security National would, at least, defend insured persons until an unambiguous coverage decision is made.

Section VIII.B. of the Policy provides:

> [T]he Insurer shall have an obligation to pay **defense expenses**, determined by the Insurer to be part of a covered **loss**, on a current basis. As a condition of any advance payments for **defense expenses** the **insured persons** or the **company** agree to repay to the Insurer any **defense expenses** that are advanced if it is established that any such **defense expenses** are not covered under this policy.

(Policy, p. 25).[2]

Based on this provision, it is clear that Security National and the Bank contemplated the exact scenario presented by Taylor's claim and agreed that Security National would advance defense expenses, on a current basis, until a final coverage determination was made. Otherwise, the provision regarding repayment of defense expenses would be unnecessary. Nevertheless,

---

[2] Confusingly, an Endorsement to the Policy seems to delete the entire Section VIII of the Policy. (Policy at 34). However, a later Endorsement then purports to amend the language of a portion of Section VIII, despite it ostensibly having already been deleted. (Policy at 42). Accordingly, it is unclear whether Section VIII is in force, although Security National also cites to it in its Denial Letter. (*See* Denial Letter at 14). Regardless, other portions of the Policy clearly contemplate defense expenses being paid as incurred. *See, e.g.*, (Policy at 20, Section IV.A.7 (discussing "repayment" of Insurer)).

Security National has refused to advance reasonable defense expenses while this action has been pending.

Therefore, Taylor respectfully requests that the Court enter an order requiring Security National to pay these reasonable defense expenses already incurred, and reasonable defense expenses ongoing until the Court makes a final decision concerning whether Taylor's claim is covered under the Policy.

## VI.     Conclusion

For the foregoing reasons, Taylor respectfully requests that this Court enter an order granting Taylor declaratory judgment against Security National holding that Taylor is entitled to defense expenses under the Policy and that Security National is in breach of its obligations.

Respectfully submitted, this the 24th day of January, 2018.

**SIMMONS LAW FIRM, LLC**

/s/ Derek A. Shoemake
John S. Simmons (Federal ID No. 5000)
Email:  jsimmons@simmonslawfirm.com
Derek A. Shoemake (Federal ID No. 10825)
Email:  dshoemake@simmonslawfirm.com
1711 Pickens Street
Columbia, SC 29201
Tel: (803) 779-4600
Fax: (803) 254-8874

**BANNISTER, WYATT & STALVEY, LLC**

/s/ James W. Bannister
James W. Bannister
Fed. ID No.: 6902; S.C. Bar No.: 8895
email:  jbannister@bannisterwyatt.com
Luke A. Burke
Fed ID No.: 11322; S.C. Bar No.: 100033
Email: lburke@bannisterwyatt.com
Post Office Box 10007
Greenville, SC 29603

Telephone:  864.298.0084
Facsimile:  864.298.0149


**WARD AND SMITH, P.A.**

/s/ Caitlin M. Poe
Caitlin M. Poe
N.C. State Bar I.D. No.:  44713
email:  cmpoe@wardandsmith.com
Post Office Box 33009
Raleigh, NC  27636-3009
Telephone:  919.277.9100
Facsimile:  919.277.9177
Admitted Pro Hac Vice

*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the foregoing by filing with CM/ECF, which will serve notice of filing on the following:

> Adam C. Bach, Esq.
> R. Hudson Smith, Esq.
> Eller Tonnsen Bach, LLC
>
> Joseph A. Nilan, Esq.
> Daniel A. Ellerbrock, Esq.
> Gregerson, Rosow, Johnson & Nilan
>
> *Attorneys for the Defendant*

This the 24th day of January, 2018.

> /s/ Derek A. Shoemake
> Derek A. Shoemake